**The below described is SIGNED.**

**Dated: November 10, 2009**

_____
**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**



_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Number: 08-20105 |
| C. W. MINING COMPANY, *dba* Co-Op Mining Company, | Chapter 7 |
| Debtor. | |
| KENNETH A. RUSHTON, Chapter 7 Trustee, | |
| Plaintiff, | Adversary Proceeding No. 09-2248 |
| v. | Judge Judith A. Boulden |
| C.O.P. COAL DEVELOPMENT COMPANY; HIAWATHA COAL COMPANY, INC.; ANR, INC.; PAUL KINGSTON; JOSEPH O. KINGSTON; CHARLES REYNOLDS; MARK REYNOLDS; JOHN DAVID KINGSTON, JR.; WORLD ENTERPRISES; STANDARD INDUSTRIES, INC.; FIDELITY FUNDING COMPANY; SECURITY FUNDING, INC.; and ABM, INC., | |
| Defendants. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TRUSTEE'S OBJECTION TO C.O.P. COAL DEVELOPMENT COMPANY'S CURE CLAIM UNDER MARCH 1997 COAL OPERATING AGREEMENT (CLAIM NO. 26), C.O.P.'S PROOF OF CLAIM NO. 9 AND TRUSTEE'S FIRST, THIRD AND FOURTH CLAIMS FOR RELIEF AGAINST C.O.P. IN ADVERSARY PROCEEDING #09-2248[1]**

On April 13, 2009, the Court entered its Order Establishing Bar Date and Documentation Requirements for Cure Claims Relating to Executory Contracts and Unexpired Leases (Cure Claims Bar Date Order) [docket #570]. The Cure Claims Bar Date Order set May 5, 2009 as the bar date for filing cure claims and required, *inter alia*, "that each non-Debtor party to an Executory Contract shall specify in its proof of claim the amount claimed by such party to be required to cure any default within the meaning of 11 U.S.C. § 365(b)(1)(A) and to compensate for any actual pecuniary loss claimed as a result of any default within the meaning of 11 U.S.C .§ 365(b)(1)(B), presupposing an assumption of the Executory Contract as of June 11, 2009." Both C.O.P. Coal Development Company (COP) and ANR, Inc. (ANR) filed timely cure claims as Claims No. 26 and 27, respectively. Claim No. 26 asserts a cure claim amount of $10,982,993.86. Claim No. 27 asserts a cure amount of $11,427,507.66.

Upon request of the chapter 7 Trustee and on the basis that the claims were "largely duplicative," the Court ordered on June 16, 2009 that the Trustee was authorized to combine his objections to Claims No. 9, 26, and 27 into a single written objection [docket #693].[2] After a hearing on August 3, 2009 and by Order entered on August 12, 2009 [docket #835], the Court ordered that the Trustee's Objection to C.O.P. Coal Development Company's Cure Claim Under

---

[1]     The Court consolidated these matters solely for purposes of discovery, motions, and trial. Accordingly, these Findings of Fact and Conclusions of Law are being entered in both the main case and adversary proceeding #09-2248. Other than the caption, both documents are identical.

[2]     Claim No. 9 is COP's original proof of claim filed in this case. In addition to the same substantive grounds upon which the Trustee objected to COP's cure claim (Claim No. 26), the Trustee also objected to Claim No. 9 on the basis that it was duplicative of Claim No. 26.

March 1997 Coal Operating Agreement (Claim No. 26) and C.O.P.'s Proof of Claim No. 9 and

ANR, Inc.'s Proof of Claim No. 27 [docket #680] would be combined for trial on September 15

and 17, 2009 with Claims for Relief 1 through 4 in adversary proceeding #09-2248.[3]   The Court

also indicated at the initial pretrial conference in this adversary proceeding on August 31, 2009

that ANR's Motion for Partial Summary Judgment on ANR Lease, COP's Motion for Partial

Summary Judgment on Contract Documents, and COP's Motion for Partial Summary Judgment

on Deferred Royalties would not be set for separate oral argument but would be considered as

arguments in connection with the trial.

But the Court learned on September 14, 2009 at an initial pretrial conference in a separate

adversary proceeding that COP's counsel of record, F. Mark Hansen, was going to be indefinitely

unavailable apparently due to medical reasons.  As such, and based on the agreement of the

Trustee and ANR, the Court bifurcated and limited the issues for trial on September 15 and 17 to

only those issues affecting the validity or enforceability of certain documents alleged by ANR to

form the basis of its cure claim.  All issues related to Claims No. 9 and 26 of COP, as well as all

issues related to the actual dollar amount of any cure claim that ANR may have, were reserved for

trial at a later date. After the September 15 and 17 trial, the Court issued Findings of Fact and

Conclusions of Law On Trustee's Objection to ANR, Inc.'s Proof of Claim No. 27 and Trustee's

Second Claim For Relief Against ANR, Inc. [docket #929].

The issues related to Claims No. 9 and 26 of COP and the Trustee's first, third, and fourth

claims for relief in adversary proceeding #09-2248 were tried on October 26, 27, and 28.  At trial,

COP voluntarily reduced the amount of its claim in the claims objection proceeding although it did

not do so in the adversary proceeding.  The total amount of the cure claim asserted by COP at

---

[3]       Claims for Relief 1 through 7 and 9 had previously been bifurcated for trial from the
remaining Claims for Relief by Order entered on June 25, 2009 [adversary docket #8].  Claims for Relief 1,
3, and 4 relate specifically to COP.

trial was $4,478,677.34 compromised of the following: unpaid royalties of $1,320,930.89 plus

10% interest; and deferred royalties of $2,249,172.59 plus 10% interest.  The Court then took the

matters under advisement.

The Court has considered the evidence properly before it, assessed the credibility of the

witnesses, considered the arguments of counsel, and conducted an independent review of

applicable law.  Based on the foregoing, the Court makes the following findings of fact and

conclusions of law.[4]

## I.   JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a), and venue is appropriate

under 28 U.S.C. §§ 1408 and 1409.[5]  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

(B), and (O), and the Court may enter a final order.

## II.   FINDINGS OF FACT

The following findings of fact are established by admissions in the pleadings, by stipulation

of counsel, or through testimony or other evidence provided at trial.[6]

1.     COP and the Debtor entered into a Coal Operating Agreement in March 1997

(COP Operating Agreement) in which COP granted the Debtor "exclusive authority to operate

---

[4]     These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and
conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by
Federal Rules of Bankruptcy Procedure 9014 and 7052, and incorporates by reference all of the Court's
oral rulings made on the record during trial.  Any of the findings of fact herein are also deemed to be
conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally
binding as both.

[5]     Future statutory references are to Title 11 of the United States Code unless otherwise
indicated.

[6]     At the start of trial, the Court ruled in favor of the Trustee on a portion of the Amended
Motion in Limine as a sanction against COP for discovery abuse and excluded Albert H. Lyter III's expert
report.  The Court awarded fees to the Trustee for those fees the estate has incurred in drafting and
prosecuting the Amended Motion in Limine. The Court ordered that this sanction cannot offset any other
claim COP might have against the estate and reserved the right to impose further sanctions against COP if
the Court found that the estate had been damaged by COP's conduct during discovery.

and control [certain tracts of land] for the term of 25 years . . . for purposes reasonably incident to the mining and removal of coal . . . ."[7]

2.     There are two versions of the COP Operating Agreement that have been presented to the Court.  The first is signed by Joseph O. Kingston and D.J. Sanders and bears the notary stamp of Carl E. Kingston with an expiration date of July 1, 2000.[8]  The second version is signed by J.O. Kingston [Joseph Kingston] and B.W. Stoddard and bears the notary stamp of Carl E. Kingston with an expiration date of July 1, 2004.[9]  Both versions indicate that the agreement was signed in March 1997, but Charles Reynolds testified that he had the COP Operating Agreement re-executed in conjunction with an amendment to the LMU Application in 2001.

3.     Paragraph 2 of the COP Operating Agreement required the Debtor to pay a royalty to COP "equal to the lesser of 8% or the maximum royalty allowed by law of the average gross realization on every ton (2,000 lbs.) of coal mined and removed from the described premises."[10]

4.     Reynolds testified that the Debtor mined federal lease coal in 1998-9 but after that mined only fee coal until 2003 when mine 3 opened.  From that time forward, the Debtor mined both federal and fee coal.

5.     In June 2000, the Debtor and COP executed an Amendment to Coal Operating Agreement (the "4% Amendment") reducing the royalty rate payable under the COP Operating Agreement to 4%.[11]  It is a computer-generated, right-hand-justified document.

---

[7]     COP's Ex. 1.

[8]     Trustee's Ex. 50.

[9]     COP's Ex. 1.  The notary stamp of Leanne Stone is obscured.

[10]    COP's Ex. 1.

[11]    Trustee's Ex. 3B.

6.      Much of the controversy in this matter centers on the validity of another document entitled Amendment to Coal Operating Agreement, dated "this __ day of June, 2000."[12] (Deferral Amendment).  The original of that document was marked as COP's Exhibit 17.  It was typed with a typewriter on legal-size paper that is beige in color, and the upper lefthand corner thereof has been mutilated, apparently by removal of staples, and torn off.  It was reportedly found by Lisa McKensie without other related documents or its "Exhibit 1" in the files of a related entity which was not a party to the agreement, Standard Industries, Inc. ("Standard"), in August 2009, while she was serving as an employee of Standard.

7.      Among other things, the Deferral Amendment provides that "[t]he parties agree to use Exhibit 1 to amend paragraph 2 of the [COP Operating Agreement], which amendment shall be null and void after C.W. Mining's production exceeds an annual level of 2,000,000 tons, or the first day C.W. Mining mines using the longwall mining method."[13]

8.      COP's President, Joseph Kingston, testified that he executed the Deferral Amendment in June 2000 at the same time he executed the 4% Amendment.

9.      Joseph Kingston also testified that he signed only one copy of the 4% Amendment.

10.      A document was marked as COP's Exhibit 17A for illustrative purposes.  It appears to bear the original signature of Joseph Kingston, and its computer-generated text appears to be identical to the text of Trustee's Exhibit 3B.  It does not bear any other signature, and it does not have the words "Exhibit 1" handwritten at the top.  It is on letter-size paper and is not noticeably yellowed in color.

---

[12]      COP's Ex. 1 at 6.

[13]      COP's Ex. 1 at 6.

11.    Charles Reynolds testified that B.W. Stoddard signed the 4% Amendment and the Deferral Amendment before Joseph Kingston.  This testimony is inconsistent with COP's Exhibit 17A.

12.    COP failed to explain why the words "Exhibit 1" were missing from Exhibit 17A and from all copies of the 4% Amendment found in the hands of third parties, as discussed below.

13.    COP did not produce as a witness the other ostensible signer of the Deferral Amendment, B.W. Stoddard, who testified at the September 15 and 17 trial.

14.    Joseph Kingston does not remember if there were any signatures on the two amendments before he signed them.

15.    Joseph Kingston did testify that after he signed the one original version of the 4% Amendment, Elden Kingston took it to the Debtor for signature.

16.    It would be peculiar for business entities to enter into two agreements at the same time amending the same provision of an existing contract between them.

17.    No original of the 4% Amendment bearing both signatures was ever produced despite the Trustee's request therefore in discovery.

18.    No original of the 4% Amendment bearing the words "Exhibit 1" was ever produced.

19.    In June 2000 the Debtor and ANR, through Joseph Kingston, executed an Amendment to Coal Operating Agreement[14] dated June 30, 2000, amending the ANR Operating Agreement dated September 1999.[15]

20.    The amended royalties paragraph in this ANR Amendment is identical to the royalties paragraph in the 4% Amendment to the COP Operating Agreement.

---

[14]    Trustee's Ex. 48B.

[15]    Trustee's Ex. 48A.

21.     There was no typewritten or other document between the Debtor and ANR making the ANR Amendment temporary or providing for any deferral of royalties owed to ANR.

22.     There were logical business reasons for the Debtor to have the same royalty arrangement apply to all coal properties being operated by it.

23.     In July 2000, the Debtor began the application process with the U.S. Department of the Interior's Bureau of Land Management (BLM) seeking a federal royalty rate reduction (Application).

24.     Joseph Kingston testified that the Application was made so that the Debtor "could get the longwall up and running," but a review of the Application does not support this statement. The request for reduction of royalties focuses on the geological and environmental challenges the Debtor was facing as opposed to reducing royalty rates to give the Debtor more operating capital to purchase a longwall mining system.

25.     In the Application, the Debtor indicated that "[u]nfortunately, the reserve in general is not amenable to the industry's highest productivity and lowest cost practice: Longwall Mining,"[16] and later added that the Debtor would continue to use continuous mining in a room and pillar configuration.[17]

26.     The Application represented to the BLM that "[t]he Co-Op private coal leasing agreements are contained in the 1999 LMU submittal, which is on file at the BLM.  Attached are revisions to those agreements, dated June 2000.  Pertinent language has been highlighted."[18] Following that page the Application included copies of the 4% Amendment and the above-

---

[16]     Trustee's Ex. 49 at 0020.

[17]     Trustee's Ex. 49 at 0022-23.

[18]     Trustee's Ex. 49 at 0042.

8

described ANR Amendment, with the sentence highlighted in each that provides for a royalty of 4%.

27.    The copy of the 4% Amendment included in the Application does not bear the words "Exhibit 1" at the top.

28.    No copy of the Deferral Amendment was included in the Application.

29.    The Application represented to the BLM that "[t]he agreements which assign Co-Op Mining the right to the subject Federal Leases are contained in the 1999 LMU submittal, which is on file at the BLM.  Attached are revisions to those agreements, dated June 2000.  The pertinent language is highlighted."[19]  Following that page the Application again included copies of the 4% Amendment and the above-described ANR Amendment, with the sentence highlighted in each that provides that "Operator shall be responsible for paying all royalties on the Federal Coal Leases at the rate determined by the Lessor."[20]

30.    The copies of the 4% Amendment included in the Application do not bear the words "Exhibit 1" at the top.

31.    Again, no copy of the Deferral Amendment was included in the Application.  Its terms would have made the representation in the Application that the Debtor's royalty rate on coal produced from fee lands was 4% seriously misleading.

32.    The Application stated that "in the prevailing coal market the engineering and geologic obstacles present do not justify mining the Federal Leases without significant reductions in the operating cost structure."[21]  It added that the federal coal reserves "are economically

---

[19]    Trustee's Ex. 49 at 0046.

[20]    Trustee's Ex. 49 at 0047-48.

[21]    Trustee's Ex. 49 at 0009.

unrecoverable without a royalty rate reduction based on adverse geological and engineering conditions using standard industry operating practices."[22]

33.    The Application further stated that "[w]hile the Federal Royalty rate is currently 8%, the non-federal coal carries a 4% royalty."[23]  It computed the "economic disadvantage of the Federal Lease coal" based on a comparison of 8% on federal coal with 4% on fee land coal.[24]

34.    The Application represented that "the vast majority of Bear Canyon production has been from non-federal reserves."[25]

35.    The execution of the 4% Amendment is consistent with the Debtor's representations throughout the Application indicating that the Debtor needed the financial relief of rate reduction to continue to function and to become profitable.

36.    The Debtor submitted copies of the COP Operating Agreement with the 4% Amendment to one or more third parties, including a copy given to the BLM on or about April 20, 2001, as part of an Amendment to LMU Application.[26]  That copy does not bear the notation "Exhibit 1" at the top, nor does it include the Deferral Amendment.

37.    Despite having recently devoted one to two weeks of man-hours in searching for it, BLM personnel have not found a copy of the Deferral Amendment in any of their files.

38.    The Court finds the testimony of Jeff McKenzie of the BLM to be credible and clear.

---

[22]    Trustee's Ex. 49 at 0009.

[23]    Trustee's Ex. 49 at 0017.

[24]    Trustee's Ex. 49 at 0017.

[25]    Trustee's Ex. 49 at 0008.

[26]    Trustee's Ex. 2 at BLM00258.

39.    The Debtor provided a copy of the COP Operating Agreement with the 4%

Amendment and another amendment entitled "Second Amendment to Coal Operating Agreement"

dated June 2002 to its lender, Bank of Utah.[27]

40.    No copy of the Deferral Amendment appears in the files maintained by the Bank of

Utah in connection with its lending to the Debtor.

41.    During closing argument, COP's counsel argued that the 50% reduction in

royalties purportedly effected by the Deferral Amendment and the 4% Amendment was not

permanent, but was "simply a deferral of payment" and that the deferred royalty was "earned at

half the rate but deferred."  Thus, the deferred royalty claimed by COP, if it were a valid

obligation, was not a contingent liability as the testimony of COP's expert, Scott Kimber,

suggested.  Rather, if the Deferral Amendment existed and was valid and enforceable, the

obligation to pay deferred royalties was a liability of the Debtor incurred at the time coal was

produced and which accrued and built up over a period of more than seven years.  Only the

precise date when it would be due and payable was subject to the outcome of future events, either

annual production of 2 million tons of coal or commencement of longwall mining.  In the

Application, the Debtor projected that it would produce 2 million tons annually from 2007

through 2021.[28]  For these reasons, the deferred royalty obligation, if it existed, should have

appeared on the Debtor's financial statements and income tax returns — it did not.

42.    The Debtor prepared numerous financial statements over the period from 1999

through September 2007 and provided copies of many such financial statements to the Bank of

Utah[29] and to the Debtor's reclamation bonding company, Lyndon Property Insurance

---

[27]    Trustee's Ex. 15 at BankUtah00152-00161.

[28]    Trustee's Ex. 49 at 0037.

[29]    Trustee's Ex. 15.

Company.[30]  It appears that none of those financial statements included an obligation to COP for deferred royalties.

43.    The Debtor first produced coal using longwall mining equipment on October 31, 2007.  Clearly, the financial statements that were closest in time to that date do not include any deferred royalty obligation.  The September 30, 2007 financial statement[31] shows accounts payable of $1,500,122, whereas the deferred royalty obligation that COP claimed had accrued as of October 31, 2007, was $3,268,086.74.[32]  The December 31, 2006 financial statements[33] include only $257,325.05 owing to COP for royalties.  Had the Debtor owed millions of dollars of deferred royalties to COP at the time those financial statements were given to the Bank of Utah, its financial statements may have been materially misleading.

44.    The Debtor prepared and filed income tax returns for the years 2000 through 2006 on an accrual basis.  Its returns included a balance sheet with a line item for accounts payable. The accounts payable and expense figures reported to the Internal Revenue Service and the Utah State Tax Commission by the Debtor did not include deferred royalty obligations to COP.  Again, the clearest evidence in that regard is found in the Debtor's 2004 through 2006 tax returns.[34] COP's tax returns were also prepared on an accrual basis.

45.    COP did not produce its tax returns despite the Trustee's request for them in discovery.

---

[30]     Trustee's Ex. 42.

[31]     Trustee's Ex. 15A.

[32]     COP's accounts receivable ledgers attached to its proofs of claim.

[33]     Trustee's Ex. 15C, clarified by BankUtah00077-78 of Trustee's Ex. 15.

[34]     Trustee's Ex. 32, 33 and 34.

46.    Lisa McKensie testified that COP did not report deferred royalties owed by the Debtor in its income tax returns.

47.    In light of COP's failure to produce tax returns, the Court infers that her testimony was accurate in that regard.  Had the Debtor owed substantial deferred royalties to COP during 2004, 2005, and 2006, both its income tax returns and those of COP would have been seriously inaccurate.

48.    COP failed to produce any documents to the Trustee in the course of discovery that were specifically requested for these consolidated matters and did not produce any accounting documents to the Trustee apart from the Cure Claim.

49.    Nevertheless, COP provided its expert witness, forensic accountant Scott Kimber, with numerous documents that had been requested by the Trustee but not produced in discovery. Those documents were attached to and formed a part of the basis for Scott Kimber's expert report.[35]

50.    Many of the documents provided to Scott Kimber were COP's own records, but many others appear to be records of the Debtor that were not provided to the Trustee but as to which COP appears to have had access arranged by Leslie Miller, an assistant of Paul Kingston. Neither of them appears to be employed by COP or the Debtor.

51.    In all of the documents reviewed by Scott Kimber, no mention of any deferred royalty obligation appeared prior to the deferral invoice being issued except for the Deferral Amendment itself.[36]

---

[35]    COP's Ex. 13.

[36]    There is a reference in Exhibit 10 of the Kimber Report (COP's Ex. 13) that indicated the following: "adj to defer royalties from 8% to 4% jan 1, 2000 - July 11, 2000 -204,862.84" but this adjustment did not specifically refer to the period addressed in the Deferral Amendment (post-June 2000) and Exhibit 10 of the Kimber Report was not produced to the Trustee during the discovery process. Kimber did testify that he made a adjustment for this amount on Schedule 2.2 of his report and indicated that the adjustment was due to the application of an incorrect rate from January to July of 2000.

13

52.    Nowhere in the documents reviewed by Scott Kimber or in any other documents known to Lisa McKensie, who kept records for both COP and the Debtor, was there any running balance maintained showing a deferred royalty obligation owed to COP by the Debtor.

53.    Scott Kimber arrived at a deferred royalty calculation that was over $1 million short of the amount claimed by COP, a difference that COP did not explain, nor did it produce a document whose existence Lisa McKensie admitted that would explain how COP arrived at its $3,268,086.74 total for deferred royalties.

54.    It is evident from the expert report of Scott Kimber that COP relied upon an accounts receivable ledger and monthly invoices from June 2000 through December 2006 to support its Cure Claim and that COP failed to attach those documents to its Cure Claim.

55.    Despite the fact that many of the documents Scott Kimber relied upon were not produced in discovery, the expert report of Scott Kimber is helpful to the Court inasmuch as it reviews documentation regarding royalties prior to 2006 showing that the Debtor and COP applied royalty rates of 2% on federal coal and 4% on fee coal between mid-2000 and October 31, 2007 and in as much as it more accurately computes the balance forward amount owed to COP.

56.    Admittedly, Scott Kimber carried out his assignment based on assumptions about the interpretation of the COP Operating Agreement, the Deferral Amendment, and the 4% Amendment that were provided to him by Attorney F. Mark Hansen, but his computations are consistent with the Court's ultimate conclusion that the 4% Amendment was executed and effective after June 2000 and that the federal rate was reduced to 2% pursuant to the parties' understanding of 43 C.F.R. § 3473.3-2(d).

57.    COP's claim for deferred royalties, as supported by its Claim Nos. 9 and 26, seeks deferred royalties computed at the rate of 4% on fee coal and 2% on federal coal production.

58.     The 4% Amendment reduced the original royalty rate under the COP Operating Agreement to 4%.

59.     The Deferral Amendment made the reduction in royalties temporary, ending when longwall production began.  The Deferral Amendment provided for deferral of "50% of the royalties payable" by the Debtor to COP.

60.     In construing the Deferral Amendment and the 4% Amendment, the Court must give effect to all provisions of the documents and avoid an interpretation that would render significant parts of the documents mere surplusage.  COP's interpretation is that the parties agreed to defer "the royalties payable" under the *original* Coal Operating Agreement, i.e., the balance of the original 8% on fee land and 4% on federal land.  The Trustee's interpretation is that, if the Deferral Amendment was valid, it was an agreement to defer 50% of "the royalties payable" under the 4% Amendment so long as it was in effect.

61.     After trying to reconcile the two amendments to support COP's accounting and claims regarding deferred royalties, the Court finds that reading the two documents as one integrated amendment to the COP Operating Agreement just does not make sense.

62.     In view of the foregoing facts and the September 2008 deposition testimony of Joseph Kingston, and based on his demeanor on the witness stand, the Court does not find the trial testimony of Joseph Kingston to be credible.

63.     The weight of the evidence demonstrates that the Deferral Amendment was probably not executed until early 2007 around the time of the trial of the Aquila, Inc. suit against the Debtor in the United States District Court for the District of Utah.

64.     It appears that the Debtor also made its last payment to COP about this time, further supporting the conclusion that the Deferral Amendment was executed in early 2007.

65. The Deferral Amendment may have been executed for the purpose of giving the Debtor further relief from paying coal royalties while it made final preparations to implement the longwall system or for other reasons not disclosed to this Court.

66. The Court does find, however, that it is more likely than not that the words "Exhibit 1" were added to the 4% Amendment or a copy thereof in 2007 when the Deferral Amendment was executed.

67. The Court finds that COP has failed to meet its burdens of proof and persuasion that there was an agreement between COP and the Debtor in June of 2000 to defer half of the royalties under the COP Operating Agreement.  As a result, the Court finds that the COP Operating Agreement was amended only by the 4% Amendment in June 2000 and that the Debtor and COP calculated royalties from June 2000 to approximately February 2007 at 4% for fee coal and 2% for federal coal with no deferral amount accruing.

68. After February 2007 (beginning with coal mined in March 2007), the parties again amended the COP Operating Agreement, deferring 50% of the royalties relieving the Debtor from paying any amount to COP until the longwall began producing (although the royalties of 4% and 2% continued to accrue).

69. After implementation of the longwall system on October 31, 2007, the terms of the Deferral Amendment were satisfied and the royalty rates returned to the original rates articulated in the COP Operating Agreement of 8% on fee coal and 4% on federal coal.

70. Based on these facts, the Court finds that Scott Kimber's calculations for computation of royalties are accurate up to February 2007 when the Deferral Amendment was executed.  Thereafter, the royalty rates remained at 4% on fee land and 2% on federal land but were deferred until October 31, 2007 when the rates returned to their original amounts of 8% on fee coal and 4% on federal coal.

71.     At the time of the January 5 and 6, 2008 letter agreements and the January 6, 2008

Coal Operating Agreement between COP and the Debtor, only a few days prior to the filing of the

Involuntary Petition commencing this case, the Debtor was insolvent as admitted by COP in its

Answer.[37]  The Debtor did not receive reasonably equivalent value for the 15% interest obligation

or the $1 million signing bonus obligation provided for in those documents and those documents

were executed in violation of the United States District Court's supplemental order requiring the

parties to avoid taking steps to terminate the COP Operating Agreement.

72.     With respect to its Claim No. 9, COP claimed $1,752,382.34 as a pre-petition

claim, which included the $1 million signing bonus and interest at 15%, both of which should be

disallowed for the reason that the Debtor's obligation to pay those amounts is avoidable under

§ 548.

73.     In its Claim No. 9, COP also claimed $4,794,492.59 as a priority claim under

§ 507(a), without explaining the basis for asserting priority.  It appears that $3,268,086.74 of that

sum constituted deferred royalties, which are disallowed for the reasons stated above. That claim

also included interest that appears to have been computed at 15% per annum, which is disallowed

for the reasons stated above.

### III.   CONCLUSIONS OF LAW

The original COP Operating Agreement required the Debtor to pay royalties to COP at

the rate of 8% or the lesser of the maximum royalty allowed by law which when applied resulted

in an effective royalty rate of 8% on fee land and 4% on federal land.  The 4% Amendment was a

valid amendment of the COP Operating Agreement and was in full force and effect until the

parties again amended it with the Deferral Amendment in early 2007.  The Deferral Amendment

was in full force and effect until the implementation of the longwall mine in October 31, 2007 at

---

[37]     Trustee's Ex. 27 at ¶¶ 182 and 186.

which time the terms of that amendment were fulfilled and the royalty rates returned to the

original amounts provided for in the COP Operating Agreement.

Because the Court has found that the Deferral Amendment was not executed in June

2000, COP's request for deferred royalties from the period of June 2000 to February 2007 is

denied and COP is not entitled to 10% interest on those amounts.  The Court adopts Schedule 2.2

of Scott Kimber's expert report and the portion of Schedule 2 up to and including February 28,

2007 for unpaid royalties due to COP.  The Court rejects Schedule 3 except for the portion of the

calculation from March 31, 2007 to October 31, 2007.   From that date forward, the applicable

royalty rates are 8% on fee coal and 4% on federal coal through June 24, 2008.[38]

The COP Operating Agreement did not provide for accrual of interest on unpaid royalties.

As a result, the Court finds that COP is not entitled to interest on unpaid royalties under Utah

Code Ann. § 15-1-1(2) and the reasoning articulated in *Vali Convalescent & Care Institutions v.*

*Division of Health Care Financing*.[39]

All obligations of the Debtor under the January 5 and 6, 2008 letter agreements or the

January 6, 2008 Coal Operating Agreement were fraudulently incurred within the meaning of

§ 548 and those agreements were entered into in violation of the United States District Court's

supplemental order and will be avoided by separate order of the court.

The Trustee is ordered to prepare calculations and compute the amounts of the Cure

Claim and the original proof of claim based on the Court's above-stated conclusions.

---

[38]      At the trial, counsel for COP indicated that COP is no longer seeking any royalty payments for the period after June 24, 2008.

[39]      797 P.2d 438, 445 (Utah App. 1990) ("The district court held that § 15-1-1 does nothing more than define what the rate of interest should be in those instances where interest accrues as a matter of law but no specific rate has been agreed to; it does not create a right to interest where none otherwise exists.  We agree.  Therefore, Vali may not rely on § 15-1-1 as a statutory basis for its entitlement to interest, although if it is entitled to interest on some valid basis § 15-1-1 establishes the rate of interest to which it is entitled").  Additionally, the Court also notes that it specifically rejects Schedule 2.1 of the Kimber Report.

Because of the egregious discovery violations committed by COP, the Court orders COP
to pay all of the Trustee's fees and expenses associated with this Objection. These fees and
expenses will be reviewed by the Court at a later date and these fees and expenses cannot be
offset by any claim COP might have against the estate.

The Trustee has not established his Fourth Claim for Relief under § 547 and that claim will
be dismissed by separate order of the court.

COP's motions for summary judgment [docket #836 and #837] will be denied by separate
order of the court.

The Court orders the Trustee to prepare a separate Order and Judgment to the foregoing
effect.

----------------------------------------------- END OF DOCUMENT -------------------------------------

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW ON TRUSTEE'S OBJECTION TO C.O.P. COAL DEVELOPMENT COMPANY'S CURE CLAIM UNDER MARCH 1997 COAL OPERATING AGREEMENT (CLAIM NO. 26), C.O.P.'S PROOF OF CLAIM NO. 9 AND TRUSTEE'S FIRST, THIRD AND FOURTH CLAIMS FOR RELIEF AGAINST C.O.P. IN ADVERSARY PROCEEDING #09-2248** will be effected through the Bankruptcy Noticing Center to each party listed below and to each party that has requested notice:

C.W. Mining Company
PO Box 65809
Salt Lake City, UT 84165
*Debtor*

Russell S. Walker
David R. Williams
Woodbury & Kesler
265 East 100 South
Suite 300
Salt Lake City, UT 84111

Kenneth A. Rushton, Trustee
99 West Main Street
P. O. Box 212
Lehi, UT 84043
*Chapter 7 Trustee*

Michael N. Zundel
Prince Yeates & Geldzahler
City Centre I, Suite 900
175 East 400 south
Salt Lake City, UT 84111
*Trustee's Counsel*

Keith A. Kelly
Steven W. Call
Steve Strong
Ray Quinney & Nebeker, P.C.
36 South State St., Suite 1400
P.O. Box 45385
Salt Lake City, UT 84145-0385
*Counsel for Aquila, Inc.*

Conrad H. Johansen
Tyler Foutz
Olsen Skoubye & Nielson
999 East Murray-Holladay Road
Suite 200
Salt Lake City, UT 84117
*Counsel for Owell Precast, LLC*

John T. Morgan
US Trustees Office
Ken Garff Bldg.
405 South Main Street
Suite 300
Salt Lake City, Ut 84111

David E. Leta
Snell & Wilmer
15 West South Temple
Suite 1200
Beneficial Tower
Salt Lake City, UT 84101-1547

F. Mark Hansen
F. Mark Hansen, P.C.
431 North 1300 West
Salt Lake City, UT 84116
*Counsel for Standard Industries, Inc. et al.*

Kim Wilson
P. Matthew Cox
Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
P.O. Box 45000
Salt Lake City, UT 84145-5000
        *Counsel for Standard Industries, Inc.*
*et al.*

Danny C. Kelly
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT 84111
        *Counsel for Graymont Western US*
*Inc.*

Lon Jenkins
Troy Aramburu
JONES WALDO HOLBROOK &
MCDONOUGH, PC
170 South Main St., Suite 1500
Salt Lake City, UT 84101
        *Counsel for Lyndon Property*
*Insurance Company*

Peter W. Guyon
614 Newhouse Building
The Law Office of Peter W. Guyon, P.C.
10 Exchange Place
Salt lake City, UT 84111
        *Counsel for Hiawatha Coal*
*Company Inc.*

David E. Kingston
3212 South State Street
Salt Lake City, UT 84115
        *Counsel for ANR Company, Inc.*

ORDER SIGNED