The below described is SIGNED.



Dated: December 09, 2009
_____
**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re<br>C.W. MINING COMPANY, dba Co-Op Mining Company,<br>　　　　　Debtor. | Bankruptcy Case No. 08-20105 JAB<br>(Chapter 7) |
| KENNETH A. RUSHTON, Chapter 7 Trustee,<br>　　　　　Plaintiff,<br>　　　v.<br>C.O.P. COAL DEVELOPMENT COPMANY, et al.,<br>　　　　　Defendants. | Adversary Proceeding No.<br>09-2248 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**ARISING FROM TRIAL ON NOVEMBER 16, 17, 23, AND 24, 2009[1]**

_____

The Court has already entered several decisions containing findings and conclusions

arising from numerous evidentiary hearings in this case and related adversary proceedings, and

these decisions will be incorporated by reference as discussed more fully below.  In addition to

the foregoing, the Court has now heard four days of additional evidence on November 16, 17, 23,

and 24, 2009 on the Trustee's Fifth, part of the Sixth, and Seventh Claims for Relief in adversary

---

[1]　　　The Court consolidated these matters solely for purposes of discovery, motions, and trial. Accordingly, these Findings of Fact and Conclusions of Law are being entered in both the main case and adversary proceedings #08-2338 and #09-2248.  Other than the caption, all three documents are identical.

proceeding #09-2248 and Hiawatha's § 550(e) counterclaim for an improver's lien in adversary proceeding #08-2338.[2]  Much of this evidence was redundant of evidence presented to the Court in earlier proceedings and already discussed in prior decisions, or only marginal embellishments on such evidence that have not led the Court to reconsider its prior conclusions.

The Court has now considered the evidence properly before it, assessed the credibility of the witnesses, considered the arguments of counsel, and conducted an independent review of applicable law.  Based on the foregoing, the Court makes the following findings of fact and conclusions of law.[3]

## I.  JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a), and venue is appropriate under 28 U.S.C. §§ 1408 and 1409.  These are core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O).

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following findings of fact are established by admissions in the pleadings, by stipulation of counsel, by prior decisions of the Court, or through testimony or other evidence provided at trial.

---

[2]     ANR, Inc.'s Motion for Relief from Stay was also set to be tried simultaneously with these other matters; however, time did not allow and the Motion is now set for hearing on January 12, 2010 to the extent that the Court's findings and conclusions in connection with this trial do not moot the Motion.  The Trustee's Ninth Claim for Relief, which serves as the underpinning for Hiawatha's § 550(e) counterclaim, is set to be tried on December 10, 2009 in conjunction with the Trustee's motions to assume and assign the Debtor's operating agreements.

[3]     These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 9014 and 7052, and incorporates by reference all of the Court's oral rulings made on the record during trial.  Any of the findings of fact herein are also deemed to be conclusions of law and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.

A.     **Fifth Claim for Relief in Adversary Proceeding #09-2248**

1.     In the Fifth Claim for Relief, the Trustee seeks to have the Court determine the

meaning of the phrase "diligently and continuously operate" found in Section 5 of the Debtor's

operating agreements with both C.O.P. Coal Development Company (COP) and ANR, Inc.

(ANR).

2.     As an initial matter, both COP and ANR have argued that the Court should

dismiss the Fifth Claim for Relief because no present case or controversy exists.  This is so

because no defaults have been declared under either of the operating agreements and because the

Trustee cannot otherwise assert claims on behalf of the potential purchaser of the mine assets.

3.     "To establish Article III standing, a plaintiff must show that: (1) she has suffered

an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by the relief requested."[4]

4.     But both ANR and COP have asserted in various papers that defaults have

occurred under their respective operating agreements, including a motion for relief from the

automatic stay that ANR is currently prosecuting so that it may provide the Debtor with a formal

notice of default.

5.     Even if they had not made these assertions, however, the Court would still find

that a present case or controversy exists.  The Court will be hearing the Trustee's motion to

assume and assign these operating agreements on December 10, 2009, in connection with the

---

[4]     *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (citations omitted).

3

proposed sale of the mine assets to a third-party purchaser.  But before the Trustee may assume

the operating agreements, he must provide "adequate assurance of future performance" under the

agreements.[5]  What constitutes such future performance must be defined and is a necessary

prerequisite to the Court determining whether assumption of the operating agreements is

appropriate under § 365(b) of the Bankruptcy Code.[6]

6.      Accordingly, the Trustee has sufficiently alleged at least an imminent concrete

and particularized injury in fact due to the threat of defaults being declared under the agreement

and the need to determine his duties under § 365(b)(3) of the Bankruptcy Code.  These imminent

injuries are fairly traceable to the positions taken by both COP and ANR, and it is likely that the

relief requested by the Trustee would redress the injury.  The Court therefore finds that an actual

case or controversy in need of resolution exists at the present time.

7.      At the heart of the dispute between the parties is the amount of discretion granted

to the landlords, COP, and ANR, to determine how and when the operator must operate in order

to fulfill its requirements under the operating agreements to "diligently and continuously operate"

in a fashion that will realize the "ultimate maximum economic recovery" or, in other words,

whether the landlords have discretion to impose their own standards for the safe, efficient, and

non-wasteful operation of the mine.

8.      COP and the Debtor entered into a Coal Operating Agreement in March 1997

(COP Operating Agreement) in which COP granted the Debtor "exclusive authority to operate

---

[5]      11 U.S.C. § 365(b)(3).

[6]      As such, the Trustee is pursuing his own rights rather than a third party's as argued by COP.

4

and control [certain tracts of land] for the term of 25 years . . . for purposes reasonably incident to

the mining and removal of coal . . . ."

9.     ANR and the Debtor entered into a Coal Operating Agreement in September 1999

(ANR Operating Agreement) in which ANR granted the Debtor "exclusive authority to operate

and control [certain tracts of land] for the term of 25 years . . . for purposes reasonably incident to

the mining and removal of coal . . . ."

10.     Both the COP Operating Agreement and the ANR Operating Agreement as

subsequently amended, which were in full force and effect as of the petition date, provide the

following:

Debtor shall <u>diligently and continuously operate</u> the subject property for
the term hereof unless the operation thereof is prevented by strike, car shortages,
government regulation, any act of God, or similar cause beyond the control of
Operator, or unless all of the merchantable coal in said premises is sooner
extracted, mined and removed. Operator shall conduct all operations hereunder in
a good and minerlike manner and in a manner which will result in the <u>ultimate
maximum economic recovery</u> of coal from the property . . . .
Operator shall, in the operation and development of the premises, comply
with all applicable Federal, State, and local laws that apply to Operator's mining
operation and shall conduct its mining operations and take all actions and perform
all duties required to maintain the Federal and State mining permits and approvals
relating to the Premises. (Emphasis added.)

(Continuous Operations Clause).[7]

11.     The Code of Federal Regulations defines the terms "continued operation" and

"maximum economic recovery" as follows:[8]

(8)     Continued operation means the production of not less than
commercial quantities of recoverable coal reserves in each of the first 2 continued
operation years following the achievement of diligent development and an average

___

[7]     *See* ANR Operating Agreement, ¶ 5; COP Operating Agreement, ¶ 5. (Exh. TR 2 Sept.
BLM00251.)

[8]     43 C.F.R. § 3480.0-5(8) and (21).

amount of not less than commercial quantities of recoverable coal reserves per continued operation year thereafter, computed on a 3-year basis consisting of the continued operation year in question and the 2 preceding continued operation years.

(21)    Maximum economic recovery (MER) means that, based on standard industry operating practices, all profitable portions of a leased federal coal deposit must be mined.  At the times of MER determinations, consideration will be given to: existing proven technology; commercially available and economically feasible equipment; coal quality; quantity, and marketability; safety, exploration, operating, processing, and transportation costs; and compliance with applicable laws and regulations.  The requirement of MER does not restrict the authority of the authorized officer to ensure the conservation of the recoverable coal reserves and other resources and to prevent the wasting of coal.

12.    Under the Code of Federal Regulations definition of "continued operation" the Debtor, as the operator of the property described in the LMU Application, is required to mine 1% of the estimated recoverable coal reserves (contained in both federal and fee lands within the LMU) each year on a three-year rolling average.

13.    The Court agrees with COP and ANR that the Continuous Operations Clause is not exactly parallel with the similar phrases in the Code of Federal Regulations; however, the Court has no choice but to interpret the Continuous Operations Clause in the manner suggested by the Trustee.

14.    First, the first sentence of Section 5 echoes the language of ANR's federal leases (which do parallel the Code of Federal Regulations terms) regarding exceptions for strikes, acts of God, and the like.

15.    Second, the first paragraph as a whole speaks generally in terms of the extraction of coal and economic recovery therefrom rather than other types of "activity" on the premises.

6

16.     Most importantly, however, no coherent alternative standard for the Continuous Operations Clause was presented to the Court.  Essentially, COP and ANR argue that the Continuous Operations Clause is subject to the whim and caprice of those entities.

17.     Joseph Kingston even testified that "ultimate maximum economic recovery" could require an operator to mine even if such operations were physically possible but economically unprofitable and that he would interpret the phrase "diligently and continuously operate" differently if a new entity were to take over the Bear Canyon Mine.

18.     On the other hand, Bill Stoddard's testimony almost equated the Continuous Operations Clause with the later requirement in Section 5 that the operator "shall conduct all operations hereunder in a good and minerlike manner."

19.     Thus, the standard argued by COP and ANR apparently depends on whatever may be in Joseph Kingston's head at any particular point in time, which of course is no standard at all. There is simply no way for an independent operator—or any operator, including Hiawatha or the Debtor—to be able to know whether or not it is complying with the Continuous Operations Clause under such a "standard," and neither COP nor ANR has pointed the Court to any other basis such as case law or industry practice for interpreting the Continuous Operations Clause in a manner different than the one suggested by the Trustee.

20.     Accordingly, the Court must adopt the Trustee's interpretation of the Continuous Operations Clause and the relief requested in the Fifth Claim for Relief is GRANTED, i.e., the Continuous Operations Clause only requires the operator to mine 1% of the estimated recoverable coal reserves (contained in both federal and fee lands within the LMU) each year on a three-year rolling average, and the Debtor is not in default under the Continuous Operations Clause.

B.     **Sixth Claim for Relief in Adversary Proceeding #09-2248**

21.     The parties also tried the portion of the Sixth Claim for Relief involving (a) whether COP violated the automatic stay; (b) whether COP breached the 1997 Coal Operating Agreement with the Debtor; (c) whether either of those alleged actions caused damages to the Debtor's estate in the form of unpaid royalties owing to the Minerals Management Service (MMS) for coal mined after June 24, 2008; and (d) whether any amounts paid or payable to MMS for delinquent royalties based on coal mined by Hiawatha may be offset against COP's cure claim as allowed by the Court's decision on November 10, 2009.

22.     On July 23, 2008 in the main bankruptcy case, the Court issued its Order of Civil Contempt Against Standard Industries, Inc. and C.O.P. Coal Development Company for Violations of the Automatic Stay (Contempt Order), which is incorporated herein by reference.

23.     On August 8, 2008 in the main bankruptcy case, the Court issued its Memorandum Decision Denying in Part and Granting in Part Motion of Aquila, Inc. for Order Preserving and Protecting Assets of Bankruptcy Estate and Requesting Notice and Hearing in Connection with Debtor's Purported Sale of Substantially All Operating Assets to a Related Entity, which is incorporated herein by reference.

24.     On April 23, 2009 in the main bankruptcy case, the Court issued its Amended Memorandum Decision Denying COP Coal Development Company's Motion to Require the Trustee to Assume or Reject Lease, and Granting Trustee's Motion to Extend Time for Trustee to Assume or Reject Executory Contracts or Unexpired Leases of the Debtor, which is incorporated herein by reference.

25.     The Court made numerous findings in the aforementioned decisions regarding the circumstances and parties' conduct before, during, and after the Purchase and Sale Agreement

between the Debtor and Hiawatha was executed, including that COP violated the automatic stay by attempting to terminate its operating agreement with the Debtor and by threatening the Debtor with eviction from the mine by letter dated May 9, 2008 (May 9 Letter).  The Court has also ruled that the 1997 Operating Agreement between COP and the Debtor, which gave to the Debtor exclusive possessory and operating rights to the mine, was in full force and effect as of the petition date and has since been an asset of this bankruptcy estate.

26.     In this trial, Joseph Kingston testified that the May 9 Letter was really just intended as leverage in negotiations with Aquila to persuade it to compromise its large judgment and/or dismiss the involuntary petition commencing this bankruptcy case, but Charles Reynolds' testimony and objective analysis of the document belie the assertion that the letter was a ruse. The Court accordingly has no basis for changing its prior findings and conclusions that COP's threat of eviction constituted a stay violation.

27.     Charles Reynolds also testified that COP demanded payment of a $750,000 prepetition obligation in June 2008, in exchange for which COP promised cooperation and that it would do what it could to help the Debtor stay in business.  Such a demand would also constitute a stay violation.

28.     And on June 23, 2008, COP signed a new operating agreement with Hiawatha purporting to give Hiawatha exclusive possession of the mine premises and the right to mine and remove coal from the mine premises (Hiawatha Operating Agreement).[9]

---

[9]     Exh. TR 9A.

29.     Under § 362(a)(3) of the Bankruptcy Code, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is a violation of the automatic stay.

30.     The Debtor's exclusive rights under the 1997 Operating Agreement to possession of the mine premises and to mine and remove coal from the mine premises were property of the estate.  As such, COP's act of entering into the Hiawatha Operating Agreement and thereby purporting to transfer those same rights to Hiawatha violated the automatic stay under § 362(a)(3) as an act "to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate" and is therefore void.

31.     On or about July 1, 2008, Hiawatha, with assistance from COP and purporting to act under authority of the Hiawatha Operating Agreement, further violated the automatic stay under § 362(a)(3) by taking possession of the mine premises and commencing mining operations to remove coal from the mine premises.

32.     In the Contempt Order, the Court declared and ordered that:

   4.     Standard and COP Coal are hereby adjudged in civil contempt for intentionally violating the automatic stay after having received actual notice that an involuntary petition for relief had been filed against CWM.

   5.     Each of the acts taken by Standard and COP Coal in violation of the automatic stay, as those acts are described in the Memorandum and supporting documents filed [by] Aquila, are hereby adjudged to be declared null and void and of no force and effect.

***

   9.     All actions taken by COP Coal to terminate [the Debtor's] 1997 Operating Agreement after the Petition Date are hereby adjudged and declared to be null and void and of no force and effect and as such the 1997 Operating Agreement was not terminated by COP Coal after the petition date and remains a valid agreement between the parties.

> 10.    COP Coal shall take whatever action is necessary to restore CWM to the status quo position that it was in prior to the unlawful actions taken by COP Coal which violated the automatic stay, including but not limited to the rescinding of all of its efforts to terminate the long-term 1997 Operating Agreement . . . .[10]

33.    COP violated the Contempt Order and willfully continued its violation of the automatic stay by refusing to take any action to: (a) rescind or otherwise unwind the Hiawatha Operating Agreement; (b) restore exclusive possession of the mine to the Debtor, or (c) prevent Hiawatha from taking coal from the mine in violation of the Debtor's exclusive rights under the 1997 Operating Agreement, which acts needed to be done to restore the Debtor "to the status quo position that it was in prior to the unlawful actions which violated the automatic stay, including but not limited to the rescinding of all of its efforts to terminate the long-term 1997 Operating Agreement."

34.    Since July 1, 2008, Hiawatha, acting in concert with COP and Standard, has willfully violated the automatic stay by, among other things: (a) refusing to deliver possession of the mine to Debtor or the Trustee; (b) mining and removing approximately 1,019,347 tons of coal from the mine; and (c) purporting to sell and in fact delivering most of that coal to third parties.

35.    COP also violated the Contempt Order and the automatic stay under § 362(a)(3) by participating in or facilitating the actions described in the previous paragraph.

36.    As a result of COP's inviting Hiawatha onto the mine premises, Hiawatha mined and removed a significant quantity of coal from a portion of the premises that is owned by the United States and leased by the United States to COP.

37.    For the coal that Hiawatha took from the portion of the leased premises owned by the United States, COP was obligated to pay a royalty to MMS.

---

[10]    Contempt Order, ¶¶ 4-5, 9-10.

38.     COP and Hiawatha failed to pay the full amount of the royalty that was due to MMS on account of the coal that Hiawatha mined from the portion of the leased premises owned by the United States.

39.     Consequently, MMS has asserted a claim (COP Royalty Deficiency) against COP for royalties accrued as a result of COP's nonpayment of royalties due to MMS for coal that Hiawatha mined and removed from the mine premises.

40.     COP will lose its federal leases and thereby breach the 1997 Operating Agreement if the COP Royalty Deficiency is not paid.

41.     Additionally, the Trustee's potential buyer cannot be expected to close a purchase of the Debtor's mine operating rights until the COP Royalty Deficiency that COP created by its stay violations is cured by payment to the United States.

42.     Accordingly, the Trustee, as a practical matter, must pay or set aside sufficient funds from the sale proceeds to pay the COP Royalty Deficiency so that the sale can close.

43.     By paying the COP Royalty Deficiency from the sale proceeds, the Trustee, without receiving anything of value in return from COP, will have provided a substantial benefit to COP by extinguishing COP's unpaid royalty liability to MMS.  The Trustee, therefore, is entitled to recover the amount that it pays to MMS for the COP Royalty Deficiency under the doctrine of equitable subrogation.[11]

44.     Under these circumstances—where (a) COP incurred its debt to MMS for the COP Royalty Deficiency by installing Hiawatha on the premises as its coal operator in willful

---

[11]     *See State Farm Mut. Auto. Ins. Co. v. Northwest Nat. Ins. Co.*, 912 P.2d 983, 985 (Utah 1996) ("The right to subrogation does not depend on contractual relationships, as its purpose is to 'work out an equitable adjustment between the parties by securing the ultimate discharge of a debt by the person who, in equity and good conscience, ought to pay it.'").

violation of the automatic stay and failed to pay in full royalties due MMS, and (b) the Trustee

must pay COP's debt to MMS for the COP Royalty Deficiency from the sale proceeds to enable

the sale to close—the Trustee, under the doctrine of equitable offset, should be allowed to offset

the amount of the Trustee's payment of the COP Royalty Deficiency to MMS against COP's

approximately $1.3 million cure claim.[12]

45.     Accordingly, the Sixth Claim for Relief is GRANTED insofar as the Trustee may

offset any amounts paid or payable to MMS for delinquent royalties based on coal mined by

Hiawatha against COP's cure claim as allowed by the Court's decision on November 10, 2009.[13]

**C.     Seventh Claim for Relief in Adversary Proceeding #09-2248**

46.     In anticipation of the Trustee's possible transfer of possession of the mine

premises to a prospective buyer, the Seventh Claim for Relief "requests that the Court issue an

injunction precluding Hiawatha and all those in concert therewith from removing any property,

real or personal, from the mine premises without further order of the Court, unless the Trustee

agrees to such removal, in writing."

47.     Hiawatha admittedly claims an ownership interest in all new equipment purchased

by it since June 24, 2008 for use at the Bear Canyon Mine, regardless of whether the new

equipment is separate and removable property or whether it was used to upgrade equipment

existing at the mine on June 24, 2008.

---

[12]     *See Bichler v. DEI Systems, Inc.*, --- P.3d ----, 2009 WL 3077608 at *3-4 (Utah Sept. 29, 2009) (recognizing that, under Utah law, the doctrine of equitable offset permits a lessee to offset debts that the lessee owes to the lessor against obligations that the lessor owes to the lessee).

[13]     The Court notes that COP, Hiawatha, and Standard all have outstanding applications for administrative expense claims which are not before the Court at this time.

48.     The Trustee admits that whether property purchased, repaired, preserved, or augmented by Hiawatha rightfully belongs to Hiawatha or to this estate is a potentially factually intensive issue, potentially as to each piece of property, which is not currently ripe for decision by the Court.

49.     "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal."[14]

50.     "In order for a party to be entitled to a preliminary injunction, the party must show the following: (1) he or she will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood of success on the merits."[15]

51.     Although this has been a difficult case and the Trustee presented general concerns about potential theft of estate property by Hiawatha or its agents, the Trustee's evidence was insufficiently specific and concrete to support such concerns.  Thus, at the very least, the Trustee has failed to show irreparable harm if an injunction does not issue.

52.     Accordingly, and although Hiawatha should not take the Court's decision on this issue as license to abscond with disputed property, the Trustee's Seventh Claim for Relief requesting a preliminary injunction under Federal Rule of Bankruptcy Procedure 7065 is DISMISSED.

---

[14]     *Herff Jones, Inc. v. Okla. Grad. Servs., Inc.*, 237 Fed.Appx. 384, 387 (10th Cir. 2007) (*quoting Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005)).

[15]     *Id.* (*quoting Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006)).

**D.**    **Hiawatha's § 550(e) Counterclaim for an Improver's Lien in Adversary Proceeding #08-2338**

53.    Finally, as a counterclaim to the Trustee's recovery of the assets transferred pursuant to the Purchase and Sale Agreement or their value, Hiawatha asserts an improver's lien under § 550(e) of the Bankruptcy Code.

54.    On May 8, 2009 in adversary proceeding #08-2338, the Court issued its Memorandum Decision Denying Hiawatha Coal Company, Inc.'s Motion for Partial Summary Judgment, Granting the Chapter 7 Trustee's Cross-Motion for Summary Judgment, and Striking the Trial Dates of May 27 and 28, 2009, which is incorporated herein by reference.  In that decision, the Court found that Hiawatha failed to raise any genuine issue of material fact to support the contention that it gave any cognizable "value" under § 549(b) for the transfers effectuated by the Purchase and Sale Agreement.

55.    Despite that ruling, Hiawatha again asserted at this trial that it made money available to the Debtor to pay its postpetition trade creditors and that it borrowed this money from Standard.  There was no credible evidence to support this assertion, and the Court rejects it.

56.    At times during this bankruptcy case, Standard has asserted that it has paid off all of the Debtor's trade creditors and at other times that it has purchased all such claims.  At other times it has been asserted by Charles Reynolds, such as at this trial, that the Debtor itself paid off its postpetition trade creditors with money provided by Standard.

57.    These particular issues are likely to be the subject of future litigation already pending before this Court in other adversary proceedings between the Trustee, Standard, and others.  It is sufficient at this juncture that the Court find that Hiawatha was not a source of any cash flow to the Debtor from which the Debtor paid any postpetition vendors or anyone else.

15

58.     On September 28, 2009 in both the main bankruptcy case and adversary proceeding #09-2248, the Court issued its Findings of Fact and Conclusions of Law on Trustee's Objection to ANR, Inc.'s Proof of Claim No. 27 and Trustee's Second Claim for Relief Against ANR, Inc. In Adversary Proceeding #09-2248, which is incorporated herein by reference.  In that decision, *inter alia*, the Court found that "[t]he evidence and argument make clear that the goal was to save the Hiawatha Lease leases from either forfeiture or advance royalty payment requirements by whatever means necessary, and all indications to DOGM and the BLM were that the Debtor was in control of and was the operator of the lands covered by the Hiawatha Lease." The Court also concluded that ANR's exclusive operating agreement with the Debtor was "in full force and effect" as of the petition date.

59.     The Court has heard the evidence and argument several times that it was never the parties' intention to have the Debtor conduct mining operations on ANR's property, but the Court has ruled otherwise and sees no reason to alter that conclusion based on this trial.  To be clear, the Court finds that the Debtor was granted the exclusive right to mine certain portions of ANR's property under the extant ANR Operating Agreement and that the Debtor is the sole operator of the properties described in the LMU Application.

60.     As of the petition date, the Debtor was in sole, exclusive control of all of the property described in both the COP and ANR Operating Agreements with the Debtor.  Hiawatha had no interest in any of that same property and has never, since the petition date, had any legal interest in that property on account of any prepetition agreement with either COP or ANR.

61.     Hiawatha was, until it took over the Debtor's employees and mining operations during the gap period, a very small coal mining company engaged exclusively in aboveground

16

coal salvage and remediation operations from, and of, slurry ponds on ANR property outside of the boundaries of the ANR property covered by the ANR Operating Agreement with the Debtor.

62.     At the time Hiawatha contracted to buy the Debtor's assets on June 24, 2008, it had no full-time employees, and its president Elliot Finley was and remains employed as a full-time computer technician at another company.

63.     Mr. Finley admitted at trial that total annual receipts by Hiawatha from its coal salvaging operations, prior to the time it took over the Debtor's operations during the gap period, were only a few thousand dollars.

64.     Hiawatha had actual knowledge that the Debtor was in involuntary bankruptcy when it entered into the Purchase and Sale Agreement.  It also knew about Aquila's $24 million judgment against the Debtor, yet the only consideration that Hiawatha gave in exchange for the transfer was the assumption of various prepetition debts owed to mostly insider creditors.  Based on its express assumption of certain of the Debtor's obligations in the Purchase and Sale Agreement and Aquila's $24 million judgment against the Debtor, Hiawatha also knew or should have known of the Debtor's precarious financial condition.

65.     The circumstances surrounding negotiation of the Purchase and Sale Agreement were also unusual, including the fact that Carl Kingston represented the Debtor while Elliot Finley represented himself on behalf of Hiawatha.  Hiawatha was, to say the least, not an experienced underground mining operator at the time of the transfer.  Hiawatha was also undercapitalized, appears to have been financed by loans from the same creditors that had funded the Debtor, and continued to use the Debtor's trade vendor accounts, insurance policy, and DOGM permit after taking possession of the mine premises.

66.     Hiawatha was also subsequently aware of the Court's August 8, 2009 Preservation Order, which could not reasonably be read to have "approved" or otherwise shielded the sale to Hiawatha from potential avoidability, yet continued its attempts to close the sale by trying to persuade the BLM and DOGM to transfer the Debtor's governmental operating rights to Hiawatha.

67.     Under § 550(e) of the Bankruptcy Code, only a "good faith transferee" from whom the trustee may recover property under § 550(a) has a claim to a lien on the property recovered for an "improvement" to the property or an "increase in the value of such property as a result of such improvement."  Section 550(e) is "meant to be reserved for situations involving arm's-length transfers to an outside third party."[16]

68.     "'Good faith' is not a defined term in the Bankruptcy Code, and is properly determined on a case-by-case basis.  In canvassing the relevant cases, it is apparent that a transferee is lacking 'good faith' if the transferee had 'sufficient knowledge' to place it on 'inquiry notice' that the transaction was susceptible to avoidance.  The 'type' of knowledge the transferee should have possessed depends upon the type of transaction being avoided . . . ."[17]

69.     Based on these standards, the Court's prior rulings, and the additional evidence presented at this trial, the Court concludes that Hiawatha is not a "good faith transferee" for purposes of § 550(e) because the transaction does not bear the indicia of an arm's-length transaction and because, looking objectively at the circumstances at and after the time of the transfers in question, Hiawatha at least had inquiry notice of the potential avoidability of the

---

[16]     *In re Blitstean*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989).

[17]     *In re Interstate Cigar Co., Inc.*, 285 B.R. 789, 797 (E.D.N.Y. 2002).

transfers.  If anything, the parties' conduct indicates an attempt to artfully maneuver the Debtor's

assets out from under Aquila's judgment.

      70.      Accordingly, Hiawatha's § 550(e) counterclaim for an improver's lien is

DISMISSED.[18]

### III.  CONCLUSION

Based upon the foregoing, the Court hereby determines as follows:

1.      Judgment is GRANTED on the Trustee's Fifth Claim for Relief.

2.      Judgment is GRANTED on the Trustee's Sixth Claim for Relief insofar as the

      Trustee may offset any amounts paid or payable to MMS for delinquent royalties

      based on coal mined by Hiawatha against COP's cure claim as allowed by the

      Court's decision on November 10, 2009.

3.      The Trustee's Seventh Claim for Relief is DISMISSED.

4.      Hiawatha's § 550(e) counterclaim is DISMISSED.

5.      The Court ORDERS the Trustee to prepare an Order and Judgment memorializing

      this decision within 7 days of these Findings and Conclusions being entered.

--------------------------------------------END OF DOCUMENT--------------------------------------------

---

[18]      Again, the Court notes that Hiawatha also filed an application for allowance of a $54 million administrative expense claim on October 20, 2009 which is not before the Court at this time.

_____ooo0ooo_____

## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW ARISING FROM TRIAL ON NOVEMBER 16, 17, 23, AND 24, 2009** will be effected through the Bankruptcy Noticing Center to each party listed below.

C.W. Mining Company
PO Box 65809
Salt Lake City, UT  84165
    *Debtor*

Michael N. Zundel
James C. Swindler
175 East 400 South, Suite 900
Salt Lake City, UT  84111
    *Counsel for Trustee*

Russell S. Walker
Woodbury & Kesler
265 East 100 South, Suite 300
Salt Lake City, UT  84111
    *Counsel for Charles and Mark Reynolds*

Peter W. Guyon
614 Newhouse Bldg.
10 Exchange Place
Salt Lake City, UT  84111
    *Counsel for Hiawatha*

David E. Kingston
3212 South State Street
Salt Lake City, UT  84115
    *Counsel for ANR*

Kim R. Wilson
P. Matthew Cox
Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, UT  84145-5000
    *Counsel for COP*

John T. Morgan
U.S. Trustee's Office
Ken Garff Bldg.
405 South Main Street, Suite 300
Salt Lake City, UT  84111

20