**The below described is SIGNED.**



Dated: **February 10, 2010** _____

**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re<br>C.W. MINING COMPANY, dba Co-Op Mining Company,<br><br>Debtor. | Bankruptcy Case No. 08-20105 JAB<br>(Chapter 7) |
| KENNETH A. RUSHTON, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>C.O.P. COAL DEVELOPMENT COMPANY, et al.,<br><br>Defendants. | Adversary Proceeding No. 09-2248<br><br>Judge Judith A. Boulden |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ARISING FROM
### TRIAL ON DECEMBER 10, 2009 AND JANUARY 12, 14, AND 19, 2010[1]

The Court has already entered several decisions containing findings and conclusions

arising from numerous evidentiary hearings in this case and related adversary proceedings, and

---

[1] The Court consolidated these matters solely for purposes of discovery, motions, and trial. Accordingly, these Findings of Fact and Conclusions of Law are being entered in both the main case and adversary proceedings #08-2338 and #09-2248. Other than the caption, all three documents are identical.

these decisions are incorporated by reference as law of the case.  In addition to the foregoing, the

Court has now heard four days of additional evidence and oral argument on December 10, 2009

and January 12, 14, and 19, 2010 on the following matters: (1) Trustee's Ninth Claim for Relief

(Turnover) in Adversary Proceeding #09-2248; (2) Trustee's remedy claim under § 550(a) as

against Hiawatha in Adversary Proceeding #08-2338; (3) Trustee's Motion to Assume Coal

Operating Agreements and Certain Related Contracts; (4) Trustee's Motion for Order

Authorizing Sale of Mine Assets and Assignment of Executory Contracts Under 11 U.S.C.

§§ 363 and 365; and (5) ANR Company, Inc.'s (ANR) Motion for Relief from Automatic Stay to

Give Notice of Default of ANR Operating Agreement.

The gist of the Trustee's motions and causes of action are turnover and/or recovery of

estate property, assumption and assignment of the Debtor's Operating Agreements with C.O.P.

Coal Development Company (COP) and ANR and the Debtor's Logical Mining Unit Application

(LMU Application) on file with the United States Bureau of Land Management (BLM), and sale

of certain mine-related assets to buyer Bear Canyon Mining, LLC (BCM or Buyer).[2]  These

rather fragmented matters have been intentionally packaged together for the Court's

consideration in furtherance of the Trustee's duty to "collect and reduce to money the property of

the estate . . . and close such estate as expeditiously as is compatible with the best interests of

parties in interest."  To that end, the Trustee's assumption and assignment of the Operating

Agreements are contingent upon the proposed sale being approved by the Court and successfully

closing.  Various parties strenuously object to the Trustee's motions and causes of actions,

challenging both procedural and substantive aspects of the proceedings.  ANR's motion seeks

---

[2]      11 U.S.C. § 704(a)(1).

stay relief to provide the Debtor with a notice of default for alleged breaches of the ANR

Operating Agreement.

It is equally important to note what the Court is <u>not</u> deciding in these Findings and

Conclusions.  Based on the evidence presented at trial and the parties' representations as to the

contours of the proposed transactions, the Court is not making any determinations as to the scope

of the rights being acquired by the Buyer under the Operating Agreements with respect to any

potential ability to exclude third parties from the property; appurtenant water issues; ownership

of specific items of equipment allegedly owned by Hiawatha (except those already excluded by

the Trustee under the Fourth Amended Sale Agreement with BCM); the immediate eviction of

Charles Reynolds from the COP property; and the damages claims associated with the Trustee's

Sixth Claim for Relief in Adversary Proceeding #09-2248.

The Court has now considered the evidence properly before it,[3] assessed the credibility of

the witnesses, considered the arguments of counsel, and conducted an independent review of

applicable law.[4]  Based on the foregoing, the Court makes the following findings of fact and

conclusions of law.[5]

---

[3]      Some of this evidence was redundant of evidence presented to the Court in earlier
proceedings and already discussed in prior decisions or only marginal embellishments that have not led the
Court to reconsider its prior findings and conclusions.

[4]      The Court finds that all parties have been afforded a full and fair opportunity to be heard.
In addition to the four days of evidence and oral argument, the parties submitted pretrial and post-trial briefs
that were also considered by the Court.  Certain parties also submitted further responses to the Trustee's post-
trial brief which were not solicited by the Court but have been considered anyway.

[5]      These Findings of Fact and Conclusions of Law constitute the Court's findings of fact and
conclusions of law under Federal Rule of Civil Procedure 52, made applicable to this proceeding by Federal
Rules of Bankruptcy Procedure 9014 and 7052, and incorporates by reference all of the Court's oral rulings
made on the record during trial.  Any of the findings of fact herein are also deemed to be conclusions of law
and conclusions of law herein are also deemed to be findings of fact and shall be equally binding as both.

## I.  JURISDICTION AND NOTICE

This Court has jurisdiction under 28 U.S.C. §§ 1334 and 157(a), and venue is appropriate under 28 U.S.C. §§ 1408 and 1409.  These are core proceedings under 28 U.S.C. § 157(b)(2)(A), (G), (M), (N), and (O).

The Court finds that the notice provided by the Trustee was appropriate under the circumstances as to the parties to whom such notice was provided.  Various third parties other than Charles Reynolds did not receive notice of these proceedings, and both the Trustee and the Buyer specifically indicated that the proposed sale would be subject to the alleged interests of these third parties other than Mr. Reynolds.  As to Mr. Reynolds, the Court also finds that notice to him was sufficient for purposes of the specific matters that were tried.  Although Mr. Reynolds was not specifically served pursuant to the Federal Rules of Bankruptcy Procedure, the Court finds that he had actual notice of the proceedings both before and certainly during the trial.

## II.  FINDINGS OF FACT

The following findings of fact are established by admissions in the pleadings, by stipulation of counsel, by prior decisions of the Court, or through testimony or other evidence provided at trial.  The Court has considered exhibits received into evidence to the extent referenced at trial.  The Court has also considered the demeanor and credibility of the witnesses, and in determining the weight to be given to the testimony of various witnesses regarding technical contested facts, has also considered the qualifications and experience of the witnesses.

A.    **Trustee's Ninth Claim for Relief (Turnover) in Adversary Proceeding #09-2248**

1.      In the Ninth Claim for Relief, the Trustee seeks to have the Court require turnover under § 542(a) from Hiawatha Coal Company (Hiawatha), and those acting in active concert with Hiawatha, of "all of the assets of the Debtor described, both generally and specifically, in the

June 24, 2008 Purchase and Sale Agreement between the Debtor and Hiawatha" and "[a]ll such improvements, accessions and repairs" thereto.

2.      The assets are broadly described in the postpetition Purchase and Sale Agreement (Hiawatha Purchase Agreement) between Hiawatha and the Debtor dated June 24, 2008 and include all of the Debtor's then existing mining-related assets.

3.      While Hiawatha certainly took possession of the Bear Canyon Mine, the parties dispute both the composition of the basket of assets actually or allegedly transferred pursuant to the Hiawatha Purchase Agreement and the value to be placed upon those assets. The parties do not dispute, however, that the assets have substantial value.

**B.      Trustee's remedy claim under § 550(a) as against Hiawatha in Adversary
Proceeding #08-2338**

4.      On May 8, 2009, the Court entered partial summary judgment in favor of the Trustee avoiding any Hiawatha Purchase Agreement transfers to Hiawatha from the Debtor during the gap period.

5.      Hiawatha remains in possession of the mine which is now in an idle state, although Hiawatha did perform substantial underground mining operations after the Hiawatha Purchase Agreement transfers occurred but before the mine was idled.

6.      And again, while Hiawatha certainly took possession of the mine, the basket of assets actually or allegedly transferred pursuant to the Hiawatha Purchase Agreement and their value are difficult to determine and disputed by the parties. The parties do not dispute, however, that the assets have substantial value.

7.      On the last evidentiary day of trial, Hiawatha submitted to the Trustee and the Court what it called Hiawatha Coal Company, Inc.'s Tender of Funds Pursuant to 11 USC

5

§550(a) to which was attached a copy of a $4,843,551.64 check drawn on the Bank of Utah in favor of the Trustee.

8.    The Buyer, in the Fourth Amended Sale Agreement, has offered to purchase certain mine assets for $9.1 million, with $4.1 million paid at closing and the remaining $5 million paid over time.[6]

9.    The purported "tender" was contingent on the Trustee's acceptance of Hiawatha's simultaneous offer to exchange the money represented by the check for those assets identified in the Trustee's Motions plus "all other assets which may have heretofore been avoided by the Trustee pursuant to 11 U.S.C. § 549." Hiawatha used a variety of assumptions to make various downward adjustments to the Buyer's $9.1 million bid to arrive at the amount of the "tender."

10.   Hiawatha was not willing, however, to deposit the funds represented by the check with the Court or the Trustee without receiving assurances that the funds would be returned upon demand if the alleged "tender" were not accepted.

11.   In rejecting the alleged "tender," the Trustee explained that he was concerned that the assets in exchange for which the "tender" was made were more than what the estate was selling to the Buyer under the Sale Agreement being considered by the Court,[7] that the amount being offered would not provide the estate more than what the Buyer was offering on a cash-on-

---

[6]    On January 20, 2010, Hiawatha filed its First Amended Tender of Funds Pursuant to 11 USC §550(a) raising its proposed "tender" to $4,974,054.19 ostensibly to account for the proposed Buyer's down payment increase from $3.8 million to $4.1 in the Fourth Amended Sale Agreement.

[7]    The Trustee made his evaluation of the "tender" vis-à-vis the Second Amended Sale Agreement, but as discussed *infra* the Court finds that the modifications effected by the Third Amended Sale Agreement and Fourth Amended Sale Agreement are immaterial and, if anything, improve the estate's position.

cash basis, and that the "tender" might be withdrawn if the Buyer withdrew from the proposed sale.

12.      The Court finds that the Trustee gave appropriate consideration to the "tender" and articulated a justifiable basis for rejecting the "tender."

C.      **Trustee's Motion to Assume Coal Operating Agreements and Certain Related Contracts**

13.      COP and ANR have alleged several grounds that would preclude the Trustee from assuming and assigning their respective Operating Agreements under § 365, including the Buyer's inability to obtain water, the Buyer's inadequate capitalization and workforce, the Buyer's lack of signed contracts or other assurances regarding the sale of coal, and the proposed use of the continuous mining method rather than the longwall method of extracting coal.[8]

14.      In particular, much of the evidence at trial involved the Buyer's ability to obtain water for use in operating the mine.

15.      Although the Court makes no findings at this time regarding the use of any alleged appurtenant water (or whether appurtenance is even a viable concept given the nature of the proposed transactions),[9] the Court does find that the weight of the evidence supports the Buyer's ability to obtain the use of the necessary water within an appropriately reasonable time.

---

[8]      Although the Trustee's proposed assignment of the executory contracts and unexpired leases at issue in the Motion to Assume Coal Operating Agreements and Certain Related Contracts is addressed in the Trustee's Motion for Order Authorizing Sale of Mine Assets and Assignment of Executory Contracts Under 11 U.S.C. §§ 363 and 365, the Court finds it appropriate to discuss the underlying facts and circumstances of the transactions at this time. The Court has similarly addressed both assumption and assignment simultaneously in its later Conclusions of Law.

[9]      The Court received Trustee's Exhibit 48 involving various water rights documents on file with the Utah State Engineer solely as an indication of certified copies of recorded documents with the State. The evidence and argument presented to date is insufficient for this Court, if this is even the appropriate forum, to make a determination as to any appurtenant water rights.

16.     The testimony of Ted Curtis, vice-president of Huntington Cleveland Irrigation Company, was credible and convincing that there is an active market for water shares sufficient to provide the Buyer with the opportunity to purchase water to operate the mine at a reasonable cost and within a reasonable time.

17.     The Buyer's sole member, David Stetson, also credibly testified about his efforts to identify and acquire sufficient water shares within a reasonable time.

18.     At best, the opposing evidence indicated the possibility (or worse, the threat) of lengthy administrative processes should someone object to the Buyer's efforts to obtain the necessary water shares.  And even then, the possible time range for the resolution of such processes was so large as to be almost meaningless from an evidentiary standpoint.

19.     The Buyer is a newly formed Utah limited liability company with Mr. Stetson as the current sole member.

20.     Mr. Stetson, while not a miner himself, has served as general counsel and in executive positions in several coal mining companies and has been intimately involved in the acquisition of many coal mines in recent years.

21.     As of closing of the proposed sale, the ultimate owner of the Buyer will be Kenwood Energy Global Partners or its affiliates including Kenwood Energy Partners, LLC (Kenwood), which in turn will be owned 80% by T.L Gilliams, LLC, whose principal is Tyron Gilliams, and the remaining 20% owned 10% each by Mr. Stetson and Joseph Giordano with Mr. Stetson remaining as CEO.  The undisputed evidence indicated that Mr. Giordano manages an investment fund for Mr. Gilliams of approximately $400 million.

22.     At trial, Mr. Giordano described his history in the financing and acquisition of coal mines and other energy properties and presented a bank statement showing that Kenwood

held more than $10 million in cash in its bank account earmarked for the capitalization of the Buyer. An additional $2 million in "dry powder" is also available if necessary. All of these funds available to the Buyer are in the form of loans from Kenwood.

23. Kenwood's right to payment is subordinate to the Trustee's right to payment for the remainder of the purchase price until a default occurs, and Kenwood's lien on the Buyer's assets would be limited to the total purchase price of $9.1 million.

24. The Court has already approved the Trustee's employment of Price Mine Service and Peak Alarm Company, Inc., if necessary, to operate and secure the mine during any time the Trustee might be in possession. The Buyer has entered into contracts with these same entities to provide the same services, if necessary, upon the Buyer's acquisition of the mine.

25. Price Mine Service has the resources upon short notice to supply ample skilled labor and mine management to the Buyer to operate the mine.

26. Mr. Stetson credibly testified that BCM has a firm term sheet with PacifiCorp to profitably sell coal, and the only reason a final contract had not been signed was because the Buyer did not yet own the mine.

27. Michael Weigand of Norwest Corporation also credibly testified to the accuracy and feasibility of the Buyer's projected operating plans.

28. The evidence also supported the Buyer's business judgment to use the continuous mining method rather than the longwall method for the particular coal seam in which mining will first occur.[10] Although the absolute quantity of coal may be diminished, the quality and sales price will likely outweigh any such reduction. The Buyer and Norwest also both indicated that

---

[10] The mine has historically been mined using the continuous mining method. The switch to longwall mining is a recent occurrence.

further evaluations would be made as mining progressed to ensure that maximum economic

recovery was achieved.

29.     Overall, Mr. Stetson demonstrated that he had conducted extensive due diligence

efforts with respect to the mine operations, financing, and administration.

**D.     Trustee's Motion for Order Authorizing Sale of Mine Assets and Assignment of
        Executory Contracts Under 11 U.S.C. §§ 363 and 365**

30.     On October 7, 2009, the Court entered its Order Granting Trustee's First

Amended Motion to Approve: (1) Bid Procedures in Anticipation of Assumption and

Assignment of the Debtor's Operating Agreements with C.O.P. Coal Development Company and

ANR, Inc., (2) Sale of Other Estate Assets and (3) Payment of Break-Up Fee and (4) Trustee's

Amended Motion to Obtain Credit.

31.     *Inter alia*, this Order "authorized [the Trustee] to employ and implement the bid

procedures described in the Second Amended Request for Proposals."

32.     The Second Amended Request for Proposals provides that "[t]he Trustee will

open each Preliminary Bid and will make an initial evaluation and determination to see if it

meets the guidelines of this RFP."

33.     Through his professionals, the Trustee engaged in extensive nationwide marketing

efforts to obtain a buyer for the mine in furtherance of his statutory obligation to "collect and

reduce to money the property of the estate . . . and close such estate as expeditiously as is

compatible with the best interests of parties in interest."[11]

---

[11]     11 U.S.C. § 704(a)(1).

34.    Even so, in addition to the stalking horse bid from Shelby County Mining, Inc. and Dome Capital Advisors, LLC (Shelby/Dome), the only Preliminary Bid under the Second Amended Request for Proposals was submitted by Hiawatha.

35.    At trial, the Trustee credibly testified to his reasons for rejecting Hiawatha's Preliminary Bid as not conforming with the guidelines of the Second Amended Request for Proposals and not indicating a serious willingness on Hiawatha's part to participate in the bidding process in good faith.  This rejection precluded Hiawatha from becoming a Qualifying Bidder and obviated the need for a subsequent auction process.

36.    The Trustee was concerned by Hiawatha's inclusion of certain escrow instructions in its Preliminary Bid, Hiawatha's reservation of rights to contest the underlying bid procedures even while ostensibly participating in the bidding process in good faith, and, most importantly, Hiawatha's failure to submit a bid deposit.

37.    Instead of a bid deposit, Hiawatha offered proof of existing contracts with coal customers and offered to pay the purchase price from revenue generated from future coal sales. Hiawatha also briefly offered then withdrew a proposal that the Trustee accept the assignment of the secured claim of PPMC in the amount of $1,027,443 in lieu of the required bid deposit.

38.    The Trustee concluded that these proposed modifications to the Second Amended Request for Proposals, and particularly Hiawatha's refusal to put any "skin in the game," were fatally nonconforming to the guidelines and thus prevented him from evaluating Hiawatha's Preliminary Bid as a higher or better offer in relation to Shelby/Dome's stalking horse bid, i.e., from "comparing apples to apples."

39.     The Court finds that the Trustee's articulated reasons for concluding that Hiawatha's Preliminary Bid was fatally nonconforming were rational and based upon valid economic concerns.

40.     During the course of this trial, the Second Amended Sale Agreement was further amended twice.  The Third Amended Sale Agreement replaced Shelby/Dome with BCM as the Buyer,[12] released Shelby/Dome from its guaranties, increased the down payment from $3.6 to $3.8 million, capped the estate's liability at $20,000 for achieving quiet enjoyment of the property for the Buyer, and conditioned the Buyer's requirement to close on appropriate delivery of the mine assets.  The Fourth Amended Sale Agreement only further increased the down payment from $3.8 to $4.1 million.  The $500,000 deposit paid by the Buyer remains unchanged.

41.     Under the circumstances, the Court does not find that these modifications are material and, if anything, improve the estate's position.  The evidence at trial supports the financial and operational wherewithal of the Buyer in lieu of Shelby/Dome.  The evidence also supports that this is an arm's-length transaction made in good faith by the Buyer.

42.     Several of the objecting parties have also asserted that they have obtained security interests from Hiawatha in the property being sold to the Buyer, and assert that such property is presently encumbered by their security interests filed with the appropriate governmental authorities after the entry of this Court's July 23, 2008 Contempt Order and this Court's August 8, 2008 Preservation Order.  To that extent, these asserted security interests have not been avoided by the Trustee.  But there is little contest that the legitimacy of such interests are subject to bona fide dispute, and the Court so finds.

---

[12]     Mr. Stetson is the sole member of both Dome and BCM.  Mr. Giordano is connected with both Fieldstone Capital and Kenwood.  Fieldstone Capital was the original proposed financier of the Shelby/Dome deal.

43.     As to Charles Reynolds, the Court has found that he had sufficient actual notice of the proceedings as to the specific matters that were tried.  The Court further finds that his claimed interest in a residential portion of the scale house on the COP property is subject to bona fide dispute.

**E.     ANR's Motion for Relief from Automatic Stay to Give Notice of Default of ANR Operating Agreement**

44.     ANR alleges defaults under the ANR Operating Agreement based on the Debtor's failure to protect ANR's royalty interests, obtain a mining permit on ANR's property, and pay property taxes on ANR's property.

45.     The Court has already made numerous findings and conclusions regarding the ANR Operating Agreement and the Debtor's LMU in its Findings of Fact and Conclusions of Law on Trustee's Objection to ANR, Inc.'s Proof of Claim No. 27 and Trustee's Second Claim for Relief Against ANR, Inc. in Adversary Proceeding #09-2248 and sees no need based on the evidence provided at this trial to revisit the issues again.

### III.   CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court reaches the following conclusions of law:

**A.     Trustee's Ninth Claim for Relief (Turnover) in Adversary Proceeding #09-2248**

46.     In addition to his § 550(a) claim for recovery against Hiawatha in adversary proceeding #08-2338 based on postpetition transfers already avoided under § 549, the Trustee also seeks turnover of the same property by Hiawatha under § 542(a).

47.     But § 542(a) turnover actions are limited to estate property held by others as of the petition date while § 549, and in turn §550, are "the exclusive means by which a trustee may attack post-petition transfers."[13]

48.     Moreover, although the party opposing § 542(a) turnover has the burden of proof on the issue of whether the property "is of inconsequential value or benefit to the estate,"[14] the trustee has the initial burden of proof as to whether "the asset[s] in question [are] part of the bankruptcy estate."[15]

49.     "Turnover is not intended as a remedy to determine disputed rights of parties to property, rather it is intended as the remedy to obtain what is acknowledged to be property of the bankruptcy estate."[16]

50.     The Trustee has not made such a *prima facie* showing as to the property about which the Trustee and Hiawatha have a dispute as to ownership.

51.     Accordingly, as both a general question of law and as applied to the facts of this case at this time, the Trustee's Ninth Claim for Relief is DISMISSED.

**B.     Trustee's remedy claim under § 550(a) as against Hiawatha in Adversary Proceeding #08-2338**

52.     Under § 550(a), "[i]t is within this Court's discretion to order either recovery of the property transferred or its value."[17]

---

[13]     *In re 31-33 Corp.*, 100 B.R. 744, 747-48 (Bankr. E.D. Pa. 1989).

[14]     *Unified People's Fed. Credit Union v. Yates (In re Yates)*, 332 B.R. 1 (10th Cir. BAP 2005).

[15]     *Headline Promotions, Inc. v. Trupiano (In re Headline Promotions, Inc.)*, Nos. 00-B-24010, 00-A-00849, 2001 WL 1346061 at *4 (Bankr. N.D. Ill. Oct. 30, 2001).

[16]     *Id.*

[17]     *In re Gardner*, Adv. No. 05-2605, 2007 WL 2915847 at *3 (Bankr. D. Utah Feb. 23, 2007) (citing *First Software Corp. v. Computer Assocs. Int'l, Inc. (In re First Software Corp.)*, 107 B.R. 417, 423

53.    "The purpose of § 550(a) is 'to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred' and the focus 'is not on what the transferee gained by the transaction but rather on what the bankruptcy estate lost as a result of the transfer.'"[18]

54.    "'Factors considered by courts in making this decision of whether to order recovery of the property or its value include whether the property is recoverable, whether the property has diminished in value by virtue of depreciation or conversion, whether there is conflicting evidence as to the value of the property and whether the value of the property is readily determinable and a monetary award would result in a savings to the estate.'"[19]

55.    All four factors weigh in favor of the Trustee recovering the actual assets rather than their value.  The major assets, particularly possession of the mine, are recoverable; Hiawatha mined substantial amounts of coal from the mine during its time in possession and the estate has been diminished as a result; the parties dispute the value of the property; and such value is not readily determinable.  Although "a savings to the estate" may result if certain litigation with Hiawatha were terminated, this is insufficient to overcome the remaining factors that weigh in favor of the property being recovered rather than its value.

---

(D. Mass. 1989) and *Tidwell v. Chrysler Credit Corp. (In re Blackburn)*, 90 B.R. 569, 573 (Bankr. M.D. Ga. 1987)).

[18]    *Gardner*, 2007 WL 2915847 at *3 (quoting *Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Resources, Inc.)*, 354 F.3d 1246, 1266-67 (10th Cir. 2004)).

[19]    *Gardner*, 2007 WL 2915847 at *3 (quoting 5 Collier on Bankruptcy ¶ 550.02[3] (15th ed. 2006), citing *In re Centennial Textiles, Inc.*, 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998) and *Morris v. Kansas Drywall Supply Co. (In re Classic Drywall)*, 127 B.R. 874, 877 (D. Kan. 1991)).

56.     The Trustee also made a reasonable exercise of his business judgment in rejecting Hiawatha's "tender" in favor of going forward with the proposed recovery of the property and sale to BCM.

57.     The Court, in its discretion, also concludes that recovery of the assets is more likely to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred than accepting Hiawatha's "tender" because the assets covered by the tender are overinclusive, the "tender" appears to be conditional, and the Court determines that recovery is more likely to restore the estate to the value of its assets than adopting the various assumptions and deductions used to arrive at the amount of the "tender."

58.     The Trustee's § 550(a) claim is accordingly GRANTED for recovery of the transferred property rather than its value.  The recovered property shall be turned over promptly and without damage beyond normal wear and tear and shall consist of all assets of any kind transferred pursuant to the Hiawatha Purchase Agreement, including any transfers of mere possession.  Although the Court makes no determinations at this time as to ownership of specific items of equipment allegedly owned by Hiawatha (except those already excluded by the Trustee under the Fourth Amended Sale Agreement with BCM), the Court also ORDERS the parties to cooperate in good faith to resolve such ownership issues.

**C.     Trustee's Motion to Assume Coal Operating Agreements and Certain Related Contracts**

59.     Section 365(b)(1) requires that, "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—(A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .; (B) compensates, or

provides adequate assurance that the trustee will promptly compensate, a party other than the

debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such

default; and (C) provides adequate assurance of future performance."

60.   In turn, § 365(f)(2) provides that the Trustee "may assign an executory contract or

unexpired lease of the debtor only if—(A) the trustee assumes such contract or lease in

accordance with the provisions of this section; and (B) adequate assurance of future performance

by the assignee of such contract or lease is provided, whether or not there has been a default in

such contract or lease."

61.   The Trustee has the burden to prove that the statutory requirements for

assumption and assignment have been met, including the burden to prove adequate assurance of

future performance,[20] which is the only unresolved dispute between the parties under

§§ 365(b)(1) and (f)(2).

62.   "What constitutes adequate assurance is a factual question to be determined on a

case by case basis with due regard to the nature of the parties, their past dealings and present

commercial realities."[21]

63.   "The required assurance will fall considerably short of an absolute guarantee of

performance"[22] and will be "adequate if performance is likely (i.e. more probable than not)."[23]

---

[20]   *In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008); *Texas Health Enters. Inc. v. Lytle Nursing Home (In re Texas Health Enters. Inc.)*, 72 Fed.Appx. 122, 126 (5th Cir. 2003).

[21]   *Texas Health Enters.* at 127 (quoting *In re Gen. Oil Distribs., Inc.*, 18 B.R. 654, 658 (E.D.N.Y. 1982)).

[22]   *In re Vitanza*, No. 98-19611DWS, 1998 WL 808629 at *26 (Bankr. E.D. Pa. Nov. 13, 1998) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)).

[23]   *In re PRK Enters., Inc.*, 235 B.R. 597, 603 (Bankr. E.D. Tex. 1999).

64.   "It is clear that adequate assurances need not be given for every term of an executory contract" but for those terms that are "material and economically significant."[24]

65.   A party objecting to an assignment under § 365(f) must show more than dislike for the proposed assignee; the party must show actual detriment.[25]

66.   It is proper to judge a proposed assignee's future performance by the financial strength of its backers and its operating agreements with experienced mine management companies.[26]

67.   As the court found in *Service Merchandise*, while a newly formed entity has no operating history, "this does not prevent assumption of the lease."[27]

68.   Underlying all of this, as well as the proposed sale of estate property, is the Trustee's exercise of sound business judgment.[28]

69.   Based on the evidence presented at trial, the Court concludes that adequate assurance of future performance under the COP and ANR Operating Agreements has been provided.

70.   The Buyer is likely to obtain the water it needs to operate the mine, the Buyer has made the bid deposit required under the Bid Procedures, the Buyer is adequately capitalized to make the down payment required under the Fourth Amended Sale Agreement, the Buyer has

---

[24]   *In re Fleming Cos.*, 499 F.3d 300, 305-06 (3d Cir. 2007).

[25]   *In re Fifth Ave. Originals*, 32 B.R. 648, 653-54 (Bankr. S.D.N.Y. 1983).

[26]   *In re Serv. Merch. Co., Inc.*, 297 B.R. 675, 682 (Bankr. M.D. Tenn. 2002).

[27]   *Id.* at 682, 684.

[28]   *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 723 (Bankr. D. Del. 2002) ("In order to assume and assign an executory contract or unexpired lease under section 365(f), the debtor must establish that the decision is one made in its sound business judgment.")

contracts with Price Mine Service and Peak Alarm Company, Inc. to provide miners and security

as needed, the Buyer is likely to be able to sell the coal it mines, and the proposed use of the

continuous mining method rather than the longwall method of extracting coal is an appropriate

exercise of business judgment under the circumstances at this time.

71.     Accordingly, the Motion to Assume Coal Operating Agreements and Certain

Related Contracts is GRANTED, with assumption and assignment contingent upon the closing of

the sale to the Buyer.

**D.     Trustee's Motion for Order Authorizing Sale of Mine Assets and Assignment of
         Executory Contracts Under 11 U.S.C. §§ 363 and 365**

72.     "Section 363(b)(1) of the Bankruptcy Code provides that the trustee, after notice

and a hearing, may sell other than in the ordinary course of business, property of the estate.  The

trustee is given ample discretion to administer the estate, including authority to conduct public or

private sales of estate property . . . .  The appropriate standard used by courts in reviewing a

trustee's recommendation has been enunciated in myriad ways.  These variations all fall under

the rubric of the business judgment test.  The trustee's business judgment is to be given great

judicial deference.  Nevertheless, the court must always scrutinize whether the trustee has

fulfilled his duty to maximize the value obtained from a sale, particularly in liquidation cases."[29]

73.     The Trustee engaged in extensive marketing efforts through his professionals

which resulted only in the bids by Shelby/Dome (now BCM) and Hiawatha.

74.     Although the Trustee has a duty to "maximize the value obtained from a sale," the

Trustee was not free to simply accept noncomforming bids in the hope that the inclusion of

---

[29]     *In re Psychrometric Systems, Inc.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (internal quotes
and citations omitted).

additional parties and the conduct of an auction process would inflate the purchase price for the mine assets.

75.     But even if he were free to do so, the Court concludes that his exercise of business judgment in rejecting Hiawatha's bid is appropriate under the circumstances of this case.  The Trustee found that Hiawatha's bid did not conform with the Second Amended Request for Proposals and did not demonstrate a serious effort on Hiawatha's part to participate in the bidding process.

76.     "[T]he court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the [Bankruptcy] Code."[30]

77.     "In other words, so long as the trustee can articulate reasons for his conduct (as distinct from a decision made arbitrarily or capriciously), the court will not inquire into the basis for those reasons."[31]

78.     Based on the Trustee's credibly articulated reasons for his rejection of Hiawatha's Preliminary Bid, the Court concludes that the Trustee engaged in a reasonable exercise of his business judgment.

79.     The Court also concludes that the Trustee's conduct of the marketing and ultimate sale of the mine assets, to the extent defined, to the Buyer for $9.1 million is a reasonable exercise of his business judgment.

80.     As for the claimed security interests in the property being sold, such interests are in bona fide dispute.  Accordingly, the property sold to the Buyer will be sold free and clear of

---

[30]     *In re Curlew Valley Associates*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

[31]     *Id.* at 513, n. 11a.

any such liens and encumbrances pursuant to § 363(f)(4) of the Bankruptcy Code with any valid

liens to attach to the proceeds.

81.     As for the claimed interests of Charles Reynolds in a residential portion of the

scale house, such interests are in bona fide dispute.  Accordingly, the property sold to the Buyer

will be sold free and clear of any such interests pursuant to § 363(f)(4) of the Bankruptcy Code

with any valid liens to attach to the proceeds.  The Court is not prepared, however, to rule at this

time on the ultimate issues raised by the Trustee in Adversary Proceeding #09-2798 although the

evidence already presented at this trial will be considered in connection with that proceeding at

the appropriate time.

82.     Accordingly, and as limited by the Court, the Trustee's Motion for Order

Authorizing Sale of Mine Assets and Assignment of Executory Contracts Under 11 U.S.C.

§§ 363 and 365 is GRANTED, with assumption and assignment contingent upon the closing of

the sale to the Buyer.  The Buyer is purchasing the assets, executory contracts, and unexpired

leases described in the Fourth Amended Sale Agreement in good faith and is entitled to all of the

protections provided in § 363(m) with respect thereto.  Except as otherwise discussed in these

Findings and Conclusions, the Court makes no determinations as to the scope of the rights being

acquired by the Buyer under the Operating Agreements with respect to any potential ability to

exclude third parties from the property; appurtenant water issues; ownership of specific items of

equipment allegedly owned by Hiawatha (except those already excluded by the Trustee under the

Fourth Amended Sale Agreement with BCM); the immediate eviction of Charles Reynolds from

the COP property; and the damages claims associated with the Trustee's Sixth Claim for Relief

in Adversary Proceeding #09-2248.

**E.     ANR's Motion for Relief from Automatic Stay to Give Notice of Default of ANR Operating Agreement**

83.     As the Court has already found, ANR voluntarily contributed its property to the Debtor's LMU Application with the goal of saving its federal mine leases from forfeiture by adding them to the Debtor's LMU Application.  In various documents, the Debtor was indicated as being in control of and the operator of the relevant property.

84.     It is accordingly unnecessary for anyone to obtain mining permits pertaining to ANR's property under the ANR Operating Agreement until the operator is ready to commence mining under the LMU, and the failure to have a mining permit is not a breach of the ANR Operating Agreement and will not be a breach so long as the ANR property is part of the LMU and receives the benefits of being part of the LMU by the mining operations occurring on the COP portion of the property described in the LMU.

85.     The property taxes have also been paid, albeit not by the Debtor or the Trustee but rather by Hiawatha.  Under the circumstances, the Court concludes that this distinction is immaterial.

86.     ANR's Motion for Relief from Automatic Stay to Give Notice of Default of ANR Operating Agreement is accordingly DENIED.

## IV.  CONCLUSION

Based upon the foregoing, the Court hereby determines as follows:

1.     The Trustee's Ninth Claim for Relief is DISMISSED.

2.     The Trustee's § 550(a) claim is GRANTED for recovery of the transferred property rather than its value.  The recovered property shall be turned over promptly and without damage beyond normal wear and tear and shall consist of

22

all assets of any kind transferred pursuant to the Hiawatha Purchase Agreement, including any transfers of mere possession.  Although the Court makes no determinations at this time as to ownership of specific items of equipment allegedly owned by Hiawatha (except those already excluded by the Trustee under the Fourth Amended Sale Agreement with BCM), the Court also ORDERS the parties to cooperate in good faith to resolve such ownership issues.

3.      The Trustee's Motion to Assume Coal Operating Agreements and Certain Related Contracts is GRANTED, with assumption and assignment contingent upon the closing of the sale to the Buyer.

4.      As limited by the Court, the Trustee's Motion for Order Authorizing Sale of Mine Assets and Assignment of Executory Contracts Under 11 U.S.C. §§ 363 and 365 is GRANTED, with assumption and assignment contingent upon the closing of the sale to the Buyer.  The Buyer is purchasing the assets, executory contracts, and unexpired leases described in the Fourth Amended Sale Agreement in good faith and is entitled to all of the protections provided in § 363(m) with respect thereto. Except as otherwise discussed in these Findings and Conclusions, the Court makes no determinations as to the scope of the rights being acquired by the Buyer under the Operating Agreements with respect to any potential ability to exclude third parties from the property; appurtenant water issues; ownership of specific items of equipment allegedly owned by Hiawatha (except those already excluded by the Trustee under the Fourth Amended Sale Agreement with BCM); the immediate eviction of Charles Reynolds from the COP property; and the damages

claims associated with the Trustee's Sixth Claim for Relief in Adversary

Proceeding #09-2248.

5.    ANR's Motion for Relief from Automatic Stay to Give Notice of Default of ANR

Operating Agreement is DENIED.

The Court will prepare separate Orders dismissing the Trustee's Ninth Claim for Relief,

granting the Trustee's § 550(a) recovery claim, and denying ANR's Motion for Relief from

Automatic Stay to Give Notice of Default of ANR Operating Agreement.  The Trustee is directed

to prepare a separate Order(s) regarding the remaining two Motions.

-------------------------------------------END OF DOCUMENT---------------------------------------------

_____oOo0oOo_____

## SERVICE LIST

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW
ARISING FROM TRIAL ON DECEMBER 10, 2009 AND JANUARY 12, 14, AND 19,
2010** will be effected through the Bankruptcy Noticing Center to each party listed below.

C.W. Mining Company
PO Box 65809
Salt Lake City, UT  84165
    *Debtor*

Michael N. Zundel
Richard Thornton
James C. Swindler
175 East 400 South, Suite 900
Salt Lake City, UT  84111
    *Counsel for Trustee*

Russell S. Walker
Woodbury & Kesler
265 East 100 South, Suite 300
Salt Lake City, UT  84111
    *Counsel for Charles and Mark Reynolds*

Peter W. Guyon
614 Newhouse Bldg.
10 Exchange Place
Salt Lake City, UT  84111
    *Counsel for Hiawatha*

David E. Kingston
3212 South State Street
Salt Lake City, UT  84115
    *Counsel for ANR*

Kim R. Wilson
P. Matthew Cox
Snow, Christensen & Martineau
10 Exchange Place, Eleventh Floor
Post Office Box 45000
Salt Lake City, UT  84145-5000
    *Counsel for COP*

John T. Morgan
U.S. Trustee's Office
Ken Garff Bldg.
405 South Main Street, Suite 300
Salt Lake City, UT  84111